IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






AP-74,592






SANTOS MINJAREZ, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL FROM


THE 175TH DISTRICT COURT 


BEXAR COUNTY





 Holcomb, J., delivered the opinion of the Court, in which Meyers, Price, Womack,
Johnson, Keasler, and Cochran, JJ., joined. Keller, P.J., concurred in the
disposition of point of error number five and otherwise joined the opinion of the
Court. Hervey, J., did not participate.



O P I N I O N



 Appellant was convicted of capital murder and sentenced to death. On direct appeal to this
Court, he raises nine points of error. We affirm.

SUFFICIENCY OF THE EVIDENCE

 In his eighth point of error, appellant contends the evidence is legally insufficient to
support the jury's verdict. In reviewing the legal sufficiency of the evidence, this Court looks
at all of the evidence in the light most favorable to the verdict to determine whether any
rational trier of fact could have found the essential elements of the offense beyond a
reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 316 (1979).

 Appellant was indicted for the capital murder of Rosa Rosado. The indictment alleged
that appellant intentionally and knowingly caused Rosado's death during the course of
committing or attempting to commit aggravated sexual assault, kidnapping, or robbery. If
the evidence is sufficient to support any one of the theories in the indictment, we need not
address the other theories. Kitchens v. State, 823 S.W.2d 256, 259 (Tex. Crim. App. 1991). 

 A person is guilty of capital murder if he intentionally causes the death of an
individual while committing the offense of aggravated sexual assault. Tex. Penal Code §
19.03(a)(2). A person is guilty of aggravated sexual assault if he intentionally or knowingly
causes the penetration of the anus or sexual organ of another person by any means, without
that person's consent and causes serious bodily injury or attempts to cause the death of the
victim in the course of the same criminal episode or by acts or words places the victim in fear
that death, serious bodily injury, or kidnapping will be imminently inflicted on another
person. Tex. Penal Code § 22.021.

 The record reflects that the jury was instructed on the law of parties under Texas Penal
Code § 7.02(a)(2) and (b). Under § 7.02(a)(2), a person is criminally responsible for the
conduct of another if, "acting with the intent to promote or assist the commission of the
offense, he solicits encourages, directs, aids, or attempts to aid the other person to commit
the offense." Under § 7.02(b), a person is criminally responsible if

in the attempt to carry out a conspiracy to commit one felony, another felony
is committed by one of the conspirators, all conspirators are guilty of the
felony actually committed, though having no intent to commit it, if the offense
was committed in furtherance of the unlawful purpose and was one that should
have been anticipated as a result of the carrying out of the conspiracy.


 Patricia Hernandez testified that on March 31, 2001, she telephoned her mother, 
Rosado, at home to wake her up to go to work. Rosado worked at nights and took the bus
to work. When Rosado did not return home the next morning, Patricia Hernandez contacted
the police and the Heidi Search Center. 

 Sergeant John Kellogg of the San Antonio Police Department testified that on April
5, 2001, he was assigned as a detective in the homicide unit and was contacted by an FBI
agent who had information about a homicide. Kellogg and three other officers met the FBI
agent and Asel Abdygapparova in the parking lot of a local restaurant. There,
Abdygapparova told the officers that she knew where a body was buried. Abdygapparova
directed officers to a wooded area near the University of Texas at San Antonio campus
(UTSA). While a search for the body commenced, (1) Abdygapparova led the officers to the
Stewart Motel, where, she claimed, she had been with Rosado when she died. Evidence was
collected and Abdygapparova returned to the police station, where she gave a statement
incriminating appellant. (2) Kellogg noted that Abdygapparova was pregnant. She told him the
father of her child was Ramon Hernandez.

 Based on Abdygapparova's statement, Kellogg accompanied Detective Andrew
Carian to Austin to inspect a car believed to have been used in the murder. The next day,
Kellogg was notified that evidence pertinent to this case may have been "dropped" over a
bridge and went to that location. 

 Sergeant James Estrada testified that he met with Abdygapparova and the other
detectives in the restaurant parking lot and accompanied them to the site where
Abdygapparova had said a body had been buried. He returned to the police station in the
early morning hours of April 6, 2001, where he met with appellant. Before asking any
questions, Estrada advised appellant of his rights. Appellant acknowledged that he
understood his rights and waived them, and the interview proceeded. 

 Estrada informed appellant that he was under arrest for capital murder. Appellant
denied any involvement in the murder of Rosado and stated that he was at home with his
mother and brother on the night the murder was committed. When confronted with the fact
that Abdygapparova had given the police a statement, appellant again denied any
involvement. When pressed further, appellant asked Estrada, "What do you want me to tell
you?" Estrada responded that he wanted appellant to tell the truth. Appellant then agreed
to give a written statement, which was admitted at trial. 

 In his statement, appellant related that on the night of Rosado's death, he saw her at
a bar where he had met her two weeks before. He described her as "short and small" with
long black hair. He noted that she was wearing a black jacket, black pants, and some
jewelry. Hernandez, Abdygapparova's boyfriend, was at the bar with appellant and Rosado. 
The three left together and "went riding around." Appellant decided he was drunk after
having "had about a 12 pack of Budweiser, 12 ounce bottles" and asked Hernandez to give
him a ride home. Hernandez drove him home. 

 According to appellant's statement, Estrada asked him again whether he "had anything
to do with killing that girl." Appellant denied any involvement and said that he "didn't even
know she was dead." Estrada testified that he did not know the identity of the victim until
he learned it from appellant.

 Carian testified that on April 5, 2001, he was assigned as a detective in the homicide
unit and that he met with Abdygapparova and the other officers in the restaurant parking lot. 
He accompanied them to the site where Rosado's body was recovered and then to the Stewart
Motel. Carian related that, based on Abdygapparova's statements, he obtained arrest
warrants for Ramon Hernandez and appellant. While Estrada was interviewing appellant,
Carian interviewed Hernandez but did not obtain a statement. The next day, Carian went to
Austin with Kellogg and Cynthia Hunt, an evidence technician, to inspect the vehicle that
Abdygapparova indicated had been used to abduct Rosado. When Carian returned to San
Antonio, he spoke to Hernandez again. Based on his conversation with Hernandez, Carian
went to see appellant at the jail. After advising appellant of his rights, Carian asked whether 
if appellant would be willing to give a statement. Appellant responded that he would, but not
at the jail. Carian transported appellant to the homicide office at the police station and took
his statement.

 In this second statement, appellant recounted that, on the night of Rosado's death,
Hernandez and Abdygapparova picked him up at his apartment. He identified Hernandez as
a friend from high school and Abdygapparova as Hernandez's pregnant girlfriend. When
they left in Abdygapparova's blue Honda, Abdygapparova was driving and Hernandez was
in the back seat with a woman (Rosado) who had a towel over her face. Abdygapparova
drove to Hernandez's house, where there was a shed in the back yard where they could take
Rosado. However, the the three of them decided that there were too many cars at
Hernandez's house. Hernandez instructed Abdygapparova to go inside to "get some stuff to
tie the girl up." Abdygapparova came back with a roll of thick, clear tape which Hernandez
used to tape Rosado's hands together. He also taped her mouth shut. 

 Hernandez decided they would go to a motel. They stopped at one, but Hernandez did
not like the way it looked, so they continued down the street and found another. 
Abdygapparova went into the motel office and rented a room. When they entered the motel
room, Hernandez pushed Rosado onto the bed. Abdygapparova began looking through
Rosado's purse while Hernandez stripped Rosado of her pants and underwear. Appellant
noted that Hernandez could not remove Rosado's shirt because her hands were tied in front
of her. Hernandez put a blanket on Rosado. Her head was still covered.

 Appellant related in his statement that Abdygapparova found some money in Rosado's
purse. Hernandez told Abdygapparova to go get "some douches and some bleach." When
Abdygapparova left, appellant was watching a basketball game on television. When
Abdygapparova returned with "the stuff," appellant put it in the bathroom. Abdygapparova
and Hernandez started looking through Rosado's purse again and found something to
indicate Rosado lived near Hernandez. Appellant learned "that the girl's name was Rosa"
and that she lived on the same street as Hernandez's grandmother. This led appellant to
believe Hernandez had "been watching her for a while." They also found in Rosado's purse 
a money order, a bank receipt for $3,000, and an ATM card. Abdygapparova pulled the tape
from Rosado's mouth and asked whether the money order could be cashed. Rosado replied
that it could not because it had already been filled out. Abdygapparova then asked about the
bank receipt, and Rosado told her that she no longer had the $3,000 because she had recently
paid off a student loan. Lastly, Abdygapparova asked for Rosado's ATM pin number, and
Rosado gave it to her but related that she only had about five or ten dollars in the bank. 
Rosado also told the group that she had a twelve-year-old daughter. Hernandez told Rosado
that if she did not do what they said, she would never see her daughter again.

 Abdygapparova and Hernandez then went into the bathroom. Appellant approached
Rosado and "started having sex with her." He stated that he did not use a condom and that
Rosado "probably knew it was coming, because her pants had been off." While appellant
was assaulting Rosado , Abdygapparova and Hernandez came out of the bathroom and began
to watch. Feeling uncomfortable, appellant "finished real quick." Abdygapparova then
approached Rosado to have sex but reported to Hernandez and appellant that Rosado did not
want to.

 Appellant resumed watching the basketball game while Hernandez and
Abdygapparova "moved around" Rosado and talked to her. Appellant was unsure whether 
they assaulted Rosado sexually. Hernandez and Abdygapparova then went back into the
bathroom. When they came out of the bathroom, Hernandez told Abdygapparova to get a
shovel. Appellant asked Hernandez what the shovel was for, and Hernandez replied that
Rosado had seen their faces. Appellant told Hernandez that Rosado had not seen his face,
but Hernandez said she had seen his and Abdygapparova's faces. Hernandez then instructed
appellant to go into the bathroom "while he took care of business," indicating he was going
to assault Rosado sexually. Appellant waited in the bathroom for approximately thirty-five
to forty minutes. When he came out of the bathroom, Hernandez was removing the tape from
Rosado's mouth and said, "That's it." Appellant asked what he meant, and Hernandez
replied, "She's gone." Appellant was unsure how Hernandez killed Rosado. 

 Hernandez took Rosado's body into the bathroom and cleaned it with bleach. When
he was finished, he placed Rosado's body on the carpet and wrapped it in a red blanket. 
While this was going on, Abdygapparova returned with a shovel. Abdygapparova next began
cleaning the room and removing evidence of their crime. Hernandez and appellant took
Rosado's body to the car. Abdygapparova joined them, and they drove to Hernandez's
house, where they left Rosado's purse and the rest of the items Abdygapparova removed
from the motel room. They left Hernandez's home and drove to an area near UTSA and
buried Rosado's body. The three then returned to Hernandez's house and burned Rosado's
belongings and the rest of the items from the motel room. Abdygapparova and Hernandez
drove appellant home when they were done.

 A few days later, Hernandez contacted appellant and told him that he was afraid
Rosado's body would be discovered and asked appellant whether they should move it. 
Hernandez was concerned that police would recover DNA evidence from Rosado's body that
would link them to her murder, since they both left semen. Appellant said that he did not
want to "mess with" it. Hernandez also told appellant that Abdygapparova was "freaking
out" and that he might have to kill her to keep her quiet. 

 James Garcia, a senior forensic scientist with the Bexar County Criminal Investigation
Laboratory, testified that he recovered hairs on the sweatshirt found by Kellogg. There were
hairs from Rosado's head and two pubic hairs. One pubic hair belonged to appellant and the
other belonged to Hernandez. Garon Foster, also of the Bexar County Criminal Investigation
Laboratory, testified that he found semen on a carpet sample taken from the motel room
where the offense in this case took place. Foster stated that appellant's genetic profile was
a perfect match and that "he would have to select 400 quadrillion people before [he] found
that same genetic profile again." 

 Detective Harold Bellamy testified that on the night of April 5, 2001, he was
dispatched to the Stewart Motel. While there, he received information that Abdygapparova
had purchased a shovel at a nearby Wal-Mart. Bellamy went to the Wal-Mart and obtained
a surveillance videotape of Abdygapparova purchasing the shovel on the night of March 31,
2001. Ansuya Bhagat also testified that she was the owner of the Stewart Motel and that on
March 31, 2001, Abdygapparova rented a room from her.

 Vincent DiMaio, Chief Medical Examiner of Bexar County, testified that Rosado's
autopsy revealed that she had been beaten about her face and neck. He determined that the
cause of Rosado's death was asphyxiation. However, while Rosado was still alive, an object
was traumatically introduced into her vagina, indicating sexual assault.

 Assuming that the jury believed appellant's version of his limited participation in
Rosado's aggravated sexual assault and murder, his statement alone is enough to find the
evidence legally sufficient. Clearly, appellant committed aggravated sexual assault. His
semen was found at the crime scene and he admitted to "having sex" with Rosado while her
hands were taped together and her face was covered. He did so after Rosado had been
threatened with never seeing her daughter again if she did not do as she was told. Further,
the medical examiner testified that Rosado was beaten and that an object had been
traumatically introduced into her body while she was still alive.

 With respect to Rosado's death, appellant related in his statement that Hernandez told
Abdygapparova to get a shovel because Rosado had seen their faces. Therefore, appellant 
knew Hernandez intended to kill Rosado. He then went into the bathroom while Hernandez
sexually assaulted and killed Rosado. Even if he did not strangle Rosado himself, appellant
is guilty of her murder under the law of parties, Texas Penal Code § 7.02(b), because he
should have anticipated that a murder would occur. The evidence is legally sufficient to
support the jury's finding of guilt. Appellant's eighth point of error is overruled.

 In his ninth point of error, appellant claims the evidence is factually insufficient to
support the jury's verdict. His argument proceeds as follows:

 In the case at bar, there were no witnesses to the robbery, aggravated sexual
assault, kidnaping, or murder of the complainant. Asel [Abdygapparova] and
Ramon [Hernandez] kidnaped the complainant before the Appellant ever
entered the car in which they were riding. Asel obtained the tape and Ramon
tied up the complainant. Ramon told Asel to drive them to a motel and Asel
rented the room under a false name. Asel took the money from the
complainant's purse. Asel bought the shovel. Ramon was alone in the room
with the complainant when the complainant was murdered. The alleged
intercourse between the Appellant and the complainant is insufficient to
establish the nexus necessary for capital murder. The State has failed to prove
beyond a reasonable doubt a nexus between the murder and the other offenses. 
The State has failed to prove beyond a reasonable doubt that the murder
occurred in order to facilitate the other offenses. The State has failed to prove
beyond a reasonable doubt that the Appellant personally committed the capital
murder or was a party to the capital murder.


 The evidence adduced at the guilt stage of a criminal trial may be factually insufficient
in either of two ways. Zuniga v. State, 144 S.W.3d 477, 484-485 (Tex. Crim. App. 2004). 
First, the evidence supporting the guilty verdict, when viewed in a neutral light and
considered by itself, may be too weak to support the finding of guilt beyond a reasonable
doubt. Ibid. Second, if there is both evidence supporting the guilty verdict and evidence
contrary to the guilty verdict, the contrary evidence, viewed in a neutral light, may be so
strong that the beyond-a-reasonable-doubt standard could not rationally have been met. Ibid. 


 We explained previously why the evidence adduced at trial - specifically, appellant's
own written statement, the medical testimony regarding his semen found at the crime scene,
and the medical testimony regarding Rosado's injuries - was legally sufficient to prove
appellant's guilt under the law of parties. Nothing in appellant's argument explains logically
why this evidence is factually insufficient in either of the two ways identified in Zuniga. 
Appellant's ninth point of error is overruled.

STATE'S CHALLENGE FOR CAUSE OF VENIRE MEMBER

 In his seventh point of error, appellant contends that the trial court erred in granting
the State's challenge for cause of venire member Maxine Ingram. We review the trial court's
ruling under an abuse of discretion standard and will not disturb the trial court's ruling if it
is supported by the record. Herron v. State, 86 S.W.3d 621, 629 (Tex. Crim. App. 2002). 
"We examine the record as a whole to determine whether there is support for the trial court's
ruling, deferring to the trial judge who was in a position to see and hear the venireperson." 
Id. 

 During voir dire, the prosecutor told Ingram that he wanted to talk to her about
whether she thought someone could be guilty of capital murder even though that person did
not personally commit the murder. Ingram stated, "Well, I think on that, I said I didn't agree
with that one if that person would get [as] severe [a] punishment if he wasn't the one who
actually did it." She continued, "He was there but he wasn't the one maybe to pull the gun
or do the rape or whatever. I don't think he should get [as] severe punishment as the one
who actually did it." 

 The prosecutor then explained the law of parties and posed a hypothetical question
in which two men agree to rob a convenience store. One of the men goes into the store with
a gun and demands money from the store clerk. The other man drives the car and acts as a
lookout. The prosecutor asked Ingram whether, in that situation, she would agree that the
lookout was just as guilty as the man who went into the store and stole the money. She
replied that she did not agree with that principle. The prosecutor later added to the
hypothetical by asking Ingram to assume that while the lookout, who had agreed with the
other actor to commit aggravated robbery, waited in the car, the other actor went in the store,
stole the money, and killed the store clerk. The prosecutor asked Ingram whether, under
those circumstances, she could find the lookout guilty of capital murder because he should
have anticipated a death could occur. She replied that she did not think he should be found
guilty of capital murder. The prosecutor then asked her if she understood that that was the
law and she replied that she did. She stated unequivocally that even though it was the law,
she could not follow it. The State challenged Ingram for cause. 

 Defense counsel then posed his own hypothetical question in which three kids with
baseball bats agree to beat an old lady and take her purse. During the altercation, one of the
kids hits the old lady in the head and kills her. Defense counsel asked Ingram whether she
could find the other two who did not hit the lady in the head guilty of capital murder because
they should have anticipated a death could occur. She replied that she could "[b]ecause of
the actual contact there." The trial judge granted the State's challenge for cause.

 The State may challenge for cause any venireman who expresses a bias or prejudice
against the defendant or any phase of the law upon which the State is entitled to rely for
conviction. Granados v. State, 85 S.W.3d 217, 230 (Tex. Crim. App. 2002). Jurors must be
able to keep an open mind with respect to punishment regardless of whether the defendant
is found guilty as a principal or a party, because the range of punishment is the same whether
the defendant is found guilty as a principal or a party. Johnson v. State, 982 S.W.2d 403, 406
(Tex. Crim. App. 1998).

 Appellant argues that Ingram should not have been excused because of her answers
to defense counsel's hypothetical question. However, it is clear from Ingram's responses to
the prosecutor's questions that she did not agree with the law of parties. She even stated on
the record that she could not follow the law with respect to this issue. The fact that she stated
that a participant who hit someone with a baseball bat should have anticipated a death could
occur does not change the fact that she could not follow the law. In fact, her response to
defense counsel's hypothetical shows that the only reason she could have found the
participant guilty of capital murder was because of his direct contact with the victim. The
trial court did not abuse its discretion in granting the State's challenge for cause. Appellant's
seventh point of error is overruled. 

ADMISSIBILITY OF CUSTODIAL STATEMENTS

 In his first point of error, appellant contends that the trial court erred in denying his
motion to suppress his custodial statements. "[A] defendant in a criminal case is deprived
of due process of law if his conviction is founded, in whole or in part, upon an involuntary
confession, without regard for the truth or falsity of the confession, and even though there
is ample evidence aside from the confession to support the conviction." Jackson v. Denno,
378 U.S. 368, 376 (1964). The defendant has a right to object to the use of the confession
and the right to a hearing to determine whether the confession was voluntary. Id. at 377. The
trial court is the sole fact-finder at a hearing on a motion to suppress a defendant's confession
and may choose to believe or disbelieve any or all of the witnesses' testimony. Dewberry v.
State, 4 S.W.3d 735, 747-48 (Tex. Crim. App. 1999). We review the trial court's ruling
under an abuse of discretion standard and view the evidence in the light most favorable to
the trial court's ruling. Villarreal v. State, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996). 
This Court is not at liberty to disturb any finding which is supported by the record. Id.

 At the hearing on appellant's motion to suppress his confession, Detective Frank Corn
testified that at 1:09 a.m. on April 6, 2001, he and a team of officers executed an arrest
warrant for appellant at his home. They found appellant sleeping on the floor under a
blanket. When the officers asked appellant to show his hands, he refused. He was secured
from behind and, after he was handcuffed, stated, "He should have shot me." Appellant was
then transported to the police department.

 Estrada testified that on April 6, 2001, he encountered appellant at the police
department and was asked to interview him. Before he asked appellant any questions, 
Estrada advised appellant of his Miranda (3) rights. Appellant acknowledged that he
understood his rights by initialing a "rights warning card." Appellant also dated the card and
indicated the time on it. 

 Estrada informed appellant that he was under arrest for capital murder. Appellant
denied any involvement in or knowledge about any murder. Estrada asked appellant where
he was on the night of March 31, 2001, and appellant responded that he was at home with
his mother and brother. Estrada then told appellant that he had information that appellant had
not, in fact, been home that night. Appellant continued to deny any involvement in the
murder in this case. Estrada repeated that he knew appellant was involved in the murder and
that he had not been at home on the night of March 31, 2001. Appellant again denied any
involvement in the murder. At some point, appellant became quiet, lowered his head and
stated that he did not want "to talk about this anymore." Estrada ceased asking questions. 
The two sat in silence for approximately a minute before appellant looked up and stated that
he "didn't have anything to do with this." Estrada testified that when this occurred, appellant
did not indicate that he did not want to give a statement, did not ask for a lawyer, and did not
ask to be taken back to jail.

 Estrada then resumed his questioning of appellant by repeating that he had
information that appellant was involved in a murder. Appellant paused and then asked,
"What do you want me to tell you?" Estrada replied that he wanted appellant to tell the truth. 
Appellant then told Estrada that he knew the woman who had been killed. Estrada then
asked appellant whether he would give a statement about the victim. Appellant responded
that he would, but that he "was only going to say it once."

 Estrada asked appellant to give a description of the victim, which he did. Appellant
described her clothing and her jewelry, and even referred to Rosado by name. Appellant
stated that he was with Rosado and Hernandez at a bar on the night of March 31, 2001. He
went on to state that when he left the bar with Rosado and Hernandez, he was very drunk and
that Hernandez took him home. Appellant denied any involvement in Rosado's death. When
he was finished with his statement, it was reduced to writing. Appellant then signed the
written statement, which began with a recitation of his Miranda rights. After appellant
signed his statement, Kellogg entered the interview room and mentioned Abdygapparova. 
Estrada informed appellant that he knew more had happened than appellant had indicated and
that he (i.e., Estrada) was aware that Rosado had not been picked up at a bar. Appellant then
changed his story and said that Rosado had been picked up "on the road." Appellant then
became uncomfortable and stopped responding to the officers' questions. When appellant
remained silent after a few more questions, the officers stopped talking to him. They
requested a DNA sample, which he agreed to give, but appellant refused to sign a document
consenting to a search of his body. Appellant's body was then photographed. Estrada gave
appellant his business card and told him he could call him if he had anything else to say. 
Appellant was then returned to jail. 

 Carian testified at the suppression hearing that on April 6, 2001, he came into contact
with appellant while Estrada was interviewing him. After Carian obtained a statement from
Hernandez on April 7, 2001, he again met with appellant, on April 9, 2001, at the Bexar
County Jail. He read appellant his Miranda rights, and appellant indicated he understood
those rights. Appellant then agreed to waive his rights and give Carian a statement. 
However, he did not want to give the statement at the jail. He wanted to go to the homicide
office of the police department. Carian complied with appellant's request and transported
him to the homicide office. 

 Carian testified that while appellant was giving his statement, he never indicated that
he wanted to remain silent and did not request an attorney. Carian typed appellant's
statement, which included another recitation of appellant's Miranda warnings. Appellant
read it and made corrections before signing it. Two civilian employees of the police
department were called in to witness the statement and, in their presence, appellant
acknowledged that he wanted to give the statement and that he had not been forced or
threatened to make the statement. 

 Appellant argues that his first written statement should have been suppressed because
he invoked his right to remain silent when he told Estrada that he did not want to "talk about
this any more" and remained silent for approximately a minute. He claims that although he
resumed talking with the officers, they did not re-advise him of his Miranda rights, in
violation of Michigan v. Mosley, 423 U.S. 96 (1975).

 On this record, a reasonable trial judge could have concluded (1) that, under the
totality of the circumstances, appellant's "invocation" of his right to remain silent was 
ambiguous; (2) that, nevertheless, the police ceased questioning once the "invocation" was
made; and (3) that approximately one minute after the "invocation" was made, appellant
himself reinitiated the conversation with the police. On those facts, we discern no violation
of appellant's right to remain silent. See Michigan v. Mosley, 423 U.S. at 102-104 (police
must scrupulously honor defendant's assertion of right to remain silent); James v. Marshall,
322 F.3d 103, 108 (1st Cir. 2003) (defendant's assertion of right to remain silent must be clear
and unequivocal). With respect to his second written statement, appellant alleges that when
Carian initiated contact with him on April 9, 2001, Carian failed to properly re-advise
appellant of his Miranda rights, and therefore appellant's second written statement should
not have been admitted at trial. Carian testified at the suppression hearing that when he
approached appellant at the jail, he read appellant his Miranda rights and asked whether 
appellant understood those rights. Appellant responded that he did. Thus, appellant's 
allegation is not supported by the record. Appellant's first point of error is overruled.

JURY INSTRUCTIONS

 In his second, third, fourth, fifth, and sixth points of error, appellant claims that the
trial court failed to properly instruct the jury. In reviewing a claim of charge error, we must
first decide whether error exists. Middleton v. State, 125 S.W.3d 450, 453 (Tex. Crim. App.
2003). If error is found, we then analyze that error for harm. Id. Charge error requires
reversal when the defendant has properly objected to the charge and we find "some harm"
to his rights. Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). Thus, we
review alleged jury charge error by considering two questions: (1) whether error existed in
the charge and (2) whether harm resulted from the error which requires reversal. See Posey
v. State, 966 S.W.2d 57, 60 & n.5 (Tex. Crim. App. 1998). 

 In his second point of error, appellant argues that the trial court erred in failing to
instruct the jury that "mere presence or even knowledge of an offense does not make one a
party to the offense." The instruction submitted to the jury read, "Mere presence alone will
not make a person a party to an offense." When a refused charge is adequately covered by
the charge given, there is no error. See Baldree v. State, 784 S.W.2d 676, 682 (Tex. Crim.
App. 1989). Appellant's second point of error is overruled. 

 In his third point of error, appellant claims that the trial court erred in instructing the
jury that they were authorized to find appellant guilty as a principal actor because the
evidence was insufficient to support such an instruction. However, as discussed in points of
error eight and nine, appellant's semen was found in the motel room where Rosado was
killed and he admitted to sexually assaulting her. When confronted by police, he identified
Rosado as the victim before the police even knew her identity and he gave conflicting
statements. There was no charge error, because the evidence was sufficient to support a jury
finding that appellant was guilty as a principal actor. Appellant's third point of error is
overruled. 

 In his fourth point of error, appellant contends that the trial court erred in instructing
the jury on the law of parties because the reference to "the offense" in the application
paragraph was too ambiguous. In his fifth point of error, appellant argues that the parties
charge did not include an application of the law to the facts of the case, did not require the
jury to find an intentional murder, and did not require the jury to find that appellant was
acting with or aiding his co-conspirators at the time of Rosado's death. 

 The trial court's instruction on the law of parties tracked the statute word-for-word. 
There was no error in the charge, because appellant is not entitled to anything more. Id. 
Appellant's fourth and fifth points of error are overruled. 

 In his sixth point of error, appellant alleges that the trial court erred in refusing his
request to charge the jury on unanimity. Appellant complains that, in the absence of his
proposed instruction, "four jurors could have found beyond a reasonable doubt that [he]
committed murder as a party in the course of committing aggravated sexual assault and eight
jurors could have found it was in the course of committing robbery." 

 We discern no error on the part of the trial court in rejecting appellant's proposed
instruction. We have recognized before that the jury in a capital murder case need not agree
unanimously as to which underlying felony offense the defendant committed. Martinez v.
State, 129 S.W.3d 101, 103 (Tex.Crim.App. 2004); Kitchens v. State, 823 S.W.2d 256, 258
(Tex.Crim.App. 1991). Appellant's sixth point of error is overruled. 

 We affirm the judgment of the trial court.


Delivered November 16, 2005.


Do not publish. 
1. Rosado's body was discovered later that night.
2. Although Abdygapparova gave police a statement, the contents of that statement were
not admitted at trial because Abdygapparova did not testify.
3. Miranda v. Arizona, 384 U.S. 436 (1966).